UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>CHRISTOPHER FELICIANO | No. 3:18-cr-287 (SRU) |

**ORDER**

On February 19, 2019, Feliciano pleaded guilty (pursuant to a plea agreement) to an indictment charging him with one count of possession with intent to distribute and distribution of heroin and fentanyl, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). *See* Indictment, Doc. No. 15; Min. Entry, Doc. No. 33; Plea Agreement, Doc. No. 34.[1] On May 29, 2019, I held a sentencing hearing and sentenced Feliciano to 24 months' imprisonment and three years' supervised release. *See* Min. Entry, Doc. No. 53; Judgment, Doc. No. 56 (entered on June 4, 2019). Feliciano is currently housed at the Metropolitan Detention Center in Brooklyn ("MDC Brooklyn"). *See Find an Inmate*, FED. BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited Sept. 17, 2020). Feliciano's scheduled release date is August 23, 2021.

On July 31, 2020, Feliciano (through counsel) filed a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), as amended in 2018 by the First Step Act. *See* Mot. for Release, Doc. No. 58, at 1. Feliciano contends that "extraordinary and compelling reasons" warrant his release. Feliciano's Mem. of Law in Supp. Mot. for Release ("Feliciano's Mem. of Law"), Doc. No. 59, at 1. More specifically, Feliciano seeks release based on "[t]he coronavirus pandemic . . . along with Mr. Feliciano's health conditions, specifically diabetes type one with

---

[1] Feliciano pleaded guilty to quantities of "less than ten grams of heroin and less than four grams of fentanyl." PSR, Doc. No. 39, at ¶ 22.

diabetic neuropathy and obesity, and his vulnerability to COVID-19 exposure." *Id.* Feliciano also filed relevant medical records. *See* Mot. to Seal, Doc. No. 60; Feliciano's Medical Records, Doc. No. 61. On August 3, the government filed a response. *See* Gov't Response, Doc. No. 62. The government agreed that Feliciano's "health conditions in combination with the COVID-19 pandemic" constitute an "extraordinary and compelling" reason warranting Feliciano's release and deferred to me regarding "whether the relevant 18 U.S.C. § 3553(a) factors weigh in favor of his continued detention." *Id.* at 1. For the following reasons, I **deny without prejudice** Feliciano's motion for release.

## I. Standard of Review

The First Step Act of 2018 (the "FSA") amended the language of section 3582(c)(1)(A). Before the FSA, only the Director of the Bureau of Prisons (the "BOP") could make a motion for the court to reduce a defendant's sentence based on extraordinary and compelling reasons. It is widely acknowledged that the BOP fell short in its gatekeeper role and that, as a result, too few inmates were granted compassionate release. *See, e.g.*, U.S. Dep't of Justice, Office of the Inspector General, Evaluation and Inspections Division, *The Federal Bureau of Prisons' Compassionate Release Program* i (April 2013), https://oig.justice.gov/reports/2013/e1306.pdf ("[W]e found that the existing BOP compassionate release program has been poorly managed and implemented inconsistently, likely resulting in eligible inmates not being considered for release and in terminally ill inmates dying before their requests were decided."); Shon Hopwood, *Second Looks & Second Chances*, 41 CARDOZO L. REV. 83, 105–06 (2019); William W. Berry III, *Extraordinary and Compelling: A Re-Examination of the Justifications for Compassionate Release*, 68 MD. L. REV. 850, 868 (2009) (noting that, in the 1990s, 0.01 percent of inmates annually were granted compassionate release).

Congress passed the FSA against that backdrop. The FSA altered section 3582(c)(1)(A), in part, to increase the use of compassionate release. *See* 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018) (titling changes to section 3582(c)(1)(A) as "Increasing the Use and Transparency of Compassionate Release"). In particular, the FSA amended section 3582(c)(1)(A) to allow a defendant him- or herself to bring a motion for compassionate release. Section 3582(c) now reads, in relevant part:

> (c) Modification of an imposed term of imprisonment. The court may not modify a term of imprisonment once it has been imposed except that – (1) in any case –
>
> > (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that –
> >
> > > (i)  extraordinary and compelling reasons warrant such a reduction; . . .
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

The applicable "policy statement[] issued by the Sentencing Commission" is contained in U.S.S.G. § 1B1.13, which reads, in relevant part:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent they are applicable, the court determines that—
>
> (1)
> > (A) Extraordinary and compelling reasons warrant the reduction; or
> >
> > (B) The defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

3

>(2) The defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and
>
>(3) The reduction is consistent with this policy statement.

U.S.S.G. § 1B1.13.

Two application notes to section 1B1.13 further elucidate the meaning of "extraordinary and compelling reasons." Application note three provides, simply, that rehabilitation of a defendant "is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13 cmt. n.3 (citing 28 U.S.C. § 994(t)). Application note one sets forth three specific examples of "extraordinary and compelling reasons" and also one catch-all provision. The first example explains that an inmate's medical condition rises to the level of an extraordinary and compelling reason when:

> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is –
>
>> (I) suffering from a serious physical or mental condition,
>> (II) suffering from a serious functional or cognitive impairment, or
>> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

U.S.S.G. § 1B1.13 cmt. n.1(A). The other two specific examples in application note one regard defendants over the age of 65 (U.S.S.G. § 1B1.13 cmt. n.1(B)) and situations in which an inmate may be needed to care for his children or his spouse/partner (U.S.S.G. § 1B1.13 cmt. n.1(C)). *See id.* The catch-all provision, titled "Other Reasons," provides that extraordinary and

compelling reasons also exist when, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 cmt. n.1(D).

The Sentencing Commission has not amended section 1B1.13 since Congress passed the FSA. Indeed, it could not because a quorum of the Sentencing Commission still does not exist. As a result, some anachronisms within section 1B1.13 seem in tension with the FSA. In particular, courts note that two clauses in section 1B1.13—including the catch-all provision at U.S.S.G. § 1B1.13 cmt. n.1(D)—still require that the Director of the BOP be the one to bring a motion for relief under section 3582(c)(1)(A). Of course, though, the FSA altered section 3582(c)(1)(A) directly and eliminated that requirement by allowing a defendant him- or herself to bring such a motion under certain circumstances.

As I have noted elsewhere, nearly all district courts hold that—since the FSA's passage—section 1B1.13 is not binding but is, rather, helpful guidance. *See United States v. Almontes*, 2020 WL 1812713, at *3 (D. Conn. Apr. 9, 2020) (collecting cases); *United States v. Locke*, 2020 WL 3101016, at *4 (W.D. Wash. June 11, 2020) (collecting more cases). I agree with the vast majority of district courts: I can consider whether reasons other than the inmate's medical condition, age, and family circumstances amount to an extraordinary and compelling reason to reduce that inmate's sentence.

In granting motions for reductions in sentence under section 3582(c)(1)(A) that are based on the threat posed by COVID-19, courts within this circuit and across the country have concluded that "extraordinary and compelling" reasons for release exist when an incarcerated defendant suffers from health conditions or other infirmities that make him particularly

susceptible to serious complications should he contract COVID-19.  *See, e.g.*, *United States v. Colvin*, 2020 WL 1613943, at *4 (D. Conn. Apr. 2, 2020).

The defendant bears the burden of proving that he or she is entitled to a sentence reduction.  *See United States v. Morales*, 2020 WL 2097630, at *2 (D. Conn. May 1, 2020).  Courts "have broad discretion in deciding whether to grant or deny a motion for a sentence reduction."  *United States v. Jones*, 2020 WL 2782395, at *2 (D. Conn. May 29, 2020) (quoting *United States v. Tagliaferri*, 2019 WL 6307494, at *3 (S.D.N.Y. Nov. 25, 2019)) (cleaned up).  Indeed, section 3582(c)(1)(A) grants a district court permissive authority to reduce an inmate's sentence under certain conditions.  *See* 18 U.S.C. § 3582(c)(1)(A) ("[T]he court . . . *may* reduce the term of imprisonment . . . .").  A court may not reduce a term of imprisonment without "considering the factors set forth in section 3553(a) to the extent that they are applicable."  *Id.*; *see also United States v. Torres*, 2020 WL 2815003, at *5 (S.D.N.Y. June 1, 2020) (explaining that courts must consider section 3553(a) factors before granting a sentence reduction pursuant to section 3582(c)(1)(A)).

**II.    Discussion**

A.  Background

On the morning of October 8, 2017, officers from the Enfield Police Department (the "EPD") were called to a residence where they found 24-year-old Jacob C. dead from an apparent drug overdose.  *See* PSR, Doc. No. 39, at ¶¶ 9–13.  Jacob was a recovering heroin addict who had been sober for about six months before his untimely and tragic death.  *See id.* at ¶ 12.  At the scene, EPD officers and agents from the Drug Enforcement Administration noticed Jacob's cell phone; they took it into evidence and later conducted an analysis of the phone.  *See id.* at ¶ 14.  The officers found extensive communications—seventy Facebook Messenger instant messages

and fourteen phone contacts—between Jacob and an individual later identified as Feliciano. *See id.* at ¶¶ 14, 19–21 (explaining the identification of Feliciano). Those communications evidenced that Jacob had bought drugs from Feliciano the night before Jacob died. *See id.* at ¶¶ 16–18. Feliciano later admitted that he sold Jacob drugs and that they used to "get high together." *Id.* at ¶ 86.

Feliciano, who was 28 years old at the time of this offense, has a relatively extensive criminal history. Indeed, at his sentencing, Feliciano was in criminal history category V. *See id.* at ¶ 48.[2] Importantly, Feliciano has several convictions for drug-related offenses.[3] *See id.* at ¶¶ 40–46. Before his arrest in this case, Feliciano had served two periods of incarceration for 30 months and 18 months. *See id.* at ¶¶ 41–45. When he was arrested for the instant offense, Feliciano had several pending state charges regarding both drug-related offenses and other low-level offenses of violence.[4] *See id.* at ¶¶ 50–56. At the sentencing hearing in this matter, I commented that Feliciano's "criminal history is long," goes "on and on and on," and when "[y]ou get out, you haven't learned your lesson, and you're going back."[5]

As defense counsel emphasized at the sentencing hearing in this matter, Feliciano had a difficult upbringing. Growing up, Feliciano "always lived in poverty," and his mother neglected

---

[2] Although in the plea agreement the parties calculated Feliciano's criminal history to be category III, *see* Plea Agreement, Doc. No. 34, at 4, Feliciano's criminal history was actually category V. *See* PSR, Doc. No. 39, at ¶ 123. At the sentencing hearing in this matter, I accepted Feliciano's criminal history as category V and declined to depart downward from the resultant Guidelines range based on *United States v. Fernandez*, 877 F.2d 1138 (2d Cir. 1989).

[3] Feliciano has been convicted of: (1) possession of marijuana (2008), (2) assault personnel (2009), (3) possession of narcotics (2010), (4) drugs near prohibited place (2013), (5) drugs near prohibited place (2013), (6) drugs near prohibited place (2013), (7) breach of peace, threatening in the second degree, and violation of protection order (2018). *See* PSR, Doc. No. 39, at ¶¶ 40–46.

[4] Feliciano had charges pending for: (1) breach of peace and threatening in the second degree (2017), (2) violation of protection order (2017), (3) possession with intent (2017), (4) breach of peace (2017), (5) evade injury/property (2017), (6) breach of peace, risk of injury, assault in the third degree, criminal mischief, and violation of protection order (2018), (7) breach of peace, assault in the third degree, and violation of protection order (2018). *See* PSR, Doc. No. 39, at ¶¶ 50–56.

[5] The transcript from that sentencing hearing is not yet available on this case's public docket. I have reviewed the court reporter's rough draft of the transcript.

and abused him.  *See id.* at ¶¶ 61–62.  Feliciano lived in foster care until his grandmother gained custody of him.  *See id.* at ¶ 62.  Eventually, Feliciano returned to his mother's custody, but that was little solace; Feliciano still lived in poverty and witnessed up close his mother's substance abuse issues.  *See id.* at ¶¶ 64–65.  At 13 years old, Feliciano began using marijuana and alcohol.  *See id.* at ¶ 85.  At 15 years old, Feliciano began selling drugs and spent some time in a juvenile facility after being arrested.  *See id.* at ¶ 68.  At 17 years old, Feliciano began using heroin, and by the next year he was using heroin daily.  *See id.* at ¶ 86.  Feliciano reports that he "overdosed a few times and paramedics had to administer Narcan to him."  *Id.* at ¶¶ 86, 91.  Soon, Feliciano "needed a bag (or more) in order to get out of bed in the morning."  *Id.* at ¶ 86.  Feliciano used other drugs—fentanyl, Xanax, Percocet, PCP, K-2, and cocaine—regularly.  *See id.* at ¶¶ 86–88.

Despite all that, Feliciano had shown some promise as a young adult.  For instance, Feliciano reported that he obtained his GED in 2010 while incarcerated.  *See id.* at ¶ 95.  Feliciano also showed interest in becoming a chef and reported that he graduated from Lincoln Culinary Institute in 2010.  *See id.* at ¶ 97.  Indeed, between 2010 and 2017, Feliciano was employed in a number of food establishments:  Dish Bar & Grill, Olive Garden, Max Bibo's Deli, Dunkin Donuts, and Burger King.  *See id.* at ¶¶ 98–99, 101.  Feliciano also reported that he worked for UPS, JC Penny, and the Boys and Girls Club in Hartford.  *See id.* at ¶¶ 100–01.

Feliciano has three young children with two different women.  *See id.* at ¶¶ 75–76.  At the time of sentencing, the mother of two of Feliciano's children reported mixed feelings about Feliciano.  On one hand, she noted that Feliciano "has good intentions and loves his family."  *Id.* at ¶ 79.  On the other hand, she reported that she had been involved in two domestic incidents with Feliciano "that have involved the police," that Feliciano "is a good manipulator, can be scary and controlling," and that "his drug use caused him to act in such a manner."  *Id.* at ¶ 80.

8

At the time of sentencing, Feliciano was obese. He stood 5 feet 5 inches tall and weighed 186 pounds, which yields a body mass index of 30.9. *See id.* at ¶ 81; *Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Sept. 17, 2020) (any body mass index over 30 is considered obese).[6] Feliciano was also diagnosed with diabetes with he was 18 years old. *See* PSR, Doc. No. 39, at ¶ 83. At the time of sentencing, Feliciano took insulin three times per day. *See id.* at ¶ 84. Feliciano is still prescribed insulin. *See* Feliciano's Medical Records, Doc. No. 61, at 140–41 (indicating that Feliciano has an active prescription for insulin through 2020).

At sentencing, Feliciano faced a statutory maximum penalty of 20 years' imprisonment and a Guidelines range of 21-to-27 months' imprisonment. *See id.* at ¶¶ 107–08. I imposed a within-Guidelines sentence of 24 months' imprisonment. *See* Judgment, Doc. No. 56.

B. <u>Parties' Arguments</u>

Feliciano and the government agree on most issues. For instance, the parties agree that Feliciano has exhausted his administrative remedies. *See* Feliciano's Mem. of Law, Doc. No. 59, at 11; Gov't Response, Doc. No. 62, at 3–4. The parties also agree that Feliciano has established that "extraordinary and compelling reasons" make him eligible for release. *See* Feliciano's Mem. of Law, Doc. No. 59, at 1; Gov't Response, Doc. No. 62, at 1. Finally, the parties agree that if I were to release Feliciano, I should do so to a halfway house, where Feliciano can be

---

[6] More recent medical records indicate that Feliciano still weighs either 185 or 186 pounds. *See* Feliciano's Medical Records, Doc. No. 61, at 72 (185 pounds on Feb. 29, 2020); *id.* at 82 (186 pounds on Mar. 17, 2020). Oddly, though, recent medical records also indicate that Feliciano is either 5 feet 2 inches, *see id.* at 104 (Mar. 17, 2020 measurement) or 5 feet 5 inches, *see id.* (Feb. 29, 2020 measurement); *see also* Feliciano's Mem. of Law, Doc. No. 59, at 9 (describing the discrepancy). Importantly, the PSR indicates that Feliciano is 5 feet 5 inches. *See* PSR, Doc. No. 39, at ¶ 81. Thus, in my view, the medical record that reports Feliciano's height as 5 feet 2 inches is likely an error. I take as true for purposes of this Order that Feliciano is 5 feet 5 inches and weighs 186 pounds. Those measurements correspond to a BMI of 30.9.

9

supervised by the United States Probation Office and continue to receive the support he needs to stay drug-free. *See* Feliciano's Mem. of Law, Doc. No. 59, at 13; Gov't Response, Doc. No. 62, at 7. The only topic of slight disagreement regards whether the section 3553(a) factors support Feliciano's release: Feliciano says they do, and the government defers to me on the question. *See* Feliciano's Mem. of Law, Doc. No. 59, at 11–13 (not addressing the 3553(a) factors explicitly, but making similar arguments); Gov't Response, Doc. No. 62, at 6.

### C. I Will Not Reduce Feliciano's Sentence.

Although I recognize the danger that the COVID-19 pandemic poses in jails and prisons and that Feliciano's health conditions place him at an especially high risk of serious illness should he contract COVID-19, I will not reduce Feliciano's sentence because doing so would be inconsistent with the purposes of sentencing. Pursuant to section 3553(a), I must impose a sentence that is sufficient, but not greater than necessary, to (1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment, (2) afford adequate deterrence, (3) protect the public from further crimes of the defendant, and (4) provide the defendant with training, medical care, and other treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). I also must consider other factors, including the nature and circumstances of the offense and the history and characteristics of the defendant. *See id.* at § 3553(a)(1).

At the sentencing hearing in this matter, I explained that the "two factors that are most important in thinking about this case and whether a sentence is sufficient . . . are obviously the impact, the death of Jacob, and the fairly lengthy criminal history." I explained that Feliciano's "criminal history [wa]s long" and, although there was not a history of significant violence, "it's just on and on and on. You get out, you haven't learned your lesson, and you're going back. So that criminal history gives me pause." Finally, I emphasized that "this is a serious case because

somebody died. Jacob died." And "[s]o this is a more serious case than the weight of the drugs suggests. That's the bottom line."[7]

The seriousness of the offense and Feliciano's criminal history have not changed since I sentenced Feliciano just over one year ago. What has changed are the circumstances of Feliciano's confinement. I do not intend to minimize Feliciano's elevated risk of severe illness should he contract COVID-19 or the severity of the COVID-19 pandemic. I acknowledge that those who are obese are at an increased risk for—and those with Type 1 diabetes might be at an increased risk for—severe illness from COVID-19. *People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL AND PREVENTION (last updated Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. Indeed, certain courts have released inmates based, in part, on those conditions. *See, e.g.*, *United States v. Franco*, 2020 WL 4344834, at *2–3 (S.D.N.Y. June 24, 2020) (releasing defendant who suffered from diabetes and obesity). I also acknowledge that, as a general matter, prisons and jails are "among the most dangerous places to be during an epidemic." Feliciano's Mem. of Law, Doc. No. 59, at 7; *see also Covid-19's Impact on People in Prison*, EQUAL JUSTICE INITIATIVE (Aug. 21, 2020), https://eji.org/news/covid-19s-impact-on-people-in-prison/.

Still, in determining whether "extraordinary and compelling reasons" warrant a prisoner's early release, courts routinely take into account the status of coronavirus infections at the particular institution where the defendant is housed. *See, e.g.*, *United States v. Morales*, 2020 WL 4926609, at *3–4 (D. Conn. Aug. 20, 2020) (citing, *inter alia*, *United States v. Gagne*, 2020

---

[7] As already noted, *see supra* n.5, those quotes come from my review of a rough draft of the transcript from Feliciano's sentencing hearing.

WL 1640152, at *5 (D. Conn. Apr. 2, 2020); *United States v. Gamble*, 2020 WL 1955338, at *5 (D. Conn. Apr. 23, 2020)). In this case, Feliciano is housed at MDC Brooklyn. When the parties submitted their briefs, MDC Brooklyn had "one staff-person who has tested positive, 41 staff who have recovered, and 12 inmates who have recovered." Feliciano's Mem. of Law, Doc. No. 59, at 5–6; Gov't Response, Doc. No. 62, at 4–5. The situation today is much the same: MDC Brooklyn has one inmate who has tested positive, three staff who have tested positive, 41 staff who have recovered, and 13 inmates who have recovered. *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Sept. 17, 2020); *see also United States v. Lindo*, 2020 WL 5038766, at *1 (S.D.N.Y. Aug. 26, 2020) (explaining that, as of August 26, 2020, "there is no reason to deduce that . . . the Metropolitan Detention Center in Brooklyn . . . is incapable of handling the spread of COVID-19 within its confines").

Although Feliciano's medical conditions are relatively serious, they do not automatically amount to "extraordinary and compelling reasons" warranting his release. Indeed, Feliciano does not suggest that he is "receiving inadequate treatment for" his Type 1 diabetes at the MDC Brooklyn. *Lindo*, 2020 WL 5038766, at *1. Further, "if pre-existing medical conditions such as obesity were the end of the compassionate-release inquiry, every inmate who suffers from a COVID-19 risk factor would be entitled to release, no matter the severity of his crime or the potential danger of his release to the community." *Id.* Thus, it is not clear to me whether Feliciano's Type 1 diabetes and obesity,[8] combined with the status of the coronavirus infections

---

[8] I also note that Feliciano is obese, but barely. Anyone with a BMI over 30 is obese, and Feliciano's BMI is 30.9. *See supra* n.6. Thus, if Feliciano lost just seven (7) pounds, his BMI would be 29.8, and he would be "overweight." *See Adult BMI Calculator*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last visited Sept. 17, 2020) (height of 5 feet 5 inches and weight of 179 pounds yields BMI of 29.8).

12

at MDC Brooklyn, amount to "extraordinary and compelling reasons" warranting Feliciano's release. *See* 18 U.S.C. § 3582(c)(1)(A).[9]

In any event, I need not resolve that issue because I hold that reducing Feliciano's sentence to time served would result in a sentence that would be insufficient to achieve the purposes of sentencing. The issues that I highlighted at Feliciano's sentencing hearing remain of concern. Feliciano's offense was extremely serious because it resulted in Jacob's death. Indeed, Jacob's father, who spoke at Feliciano's sentencing hearing about the pain he has suffered as a result of his son's death, "strongly opposes the defendant's early release." Gov't Response, Doc. No. 62, at 6. Releasing Feliciano now—about halfway into his sentence and having served around one year in prison—would not, in my view, sufficiently reflect the seriousness of the offense, promote respect for the law, and provide just punishment. *See* 18 U.S.C. § 3553(a)(2)(A).

I am also concerned that releasing Feliciano now would result in a sentence insufficient to protect the public from further of Feliciano's crimes. *See id.* at § 3553(a)(2)(C). As I remarked at Feliciano's sentencing hearing, Feliciano's criminal history unfortunately contains a series of drug-related crimes. Feliciano has previously served time for two of those crimes, but he has continued to sell drugs. On more than one occasion, Feliciano has done so in violation of his probation. *See* PSR, Doc. No. 39, at ¶¶ 41, 46. Thus, reducing Feliciano's sentence to the

---

[9] Indeed, numerous courts have denied inmates' motions for compassionate release even when they have "documented underlying health conditions" that make them especially vulnerable to the effects of COVID-19. *See, e.g.*, *United States v. Jones*, 2020 WL 2782395, at *5 (D. Conn. May 29, 2020); *United States v. Vadakin*, 2020 WL 4818440, at *3–4 (D. Conn. Aug. 17, 2020) (denying compassionate release to an obese inmate because "[t]he inquiry does not end there" and the "Court harbors significant concerns about the potential danger Defendant poses to the community, given his lack of treatment . . . and short period of incarceration"); *United States v. Smith*, 2020 WL 1903160, at *4 (D. Conn. Apr. 17, 2020) (denying compassionate release to inmate whose medical "condition places him in a category of persons who are especially vulnerable" because a sentence reduction "would not adequately reflect the seriousness of the defendant's offense, promote respect for the law, provide adequate deterrence to the defendant and others, or, as noted, protect the public from the defendant").

time he has already served would, in my view, not provide Feliciano with adequate deterrence. For similar reasons, I cannot find that Feliciano "is not a danger to the safety of any other person or the community, as provided under section 3142(g)." 18 U.S.C. § 3582(c)(1)(A)(ii).

Feliciano's medical conditions do not affect my section 3553(a) analysis any more than they did when I sentenced him. Indeed, Feliciano suffered from obesity and Type 1 diabetes at the time he committed the instant crime (and for many years before that). *Cf. United States v. Smith*, 2020 WL 1903160, at *4 (D. Conn. Apr. 17, 2020) (denying inmate's motion for compassionate release and explaining that the inmate's medical condition "did not at the time of the offense, and does not now, stop him from being a danger to the community"). Similarly, although certain aspects of Feliciano's personal history display promise—particularly his persistent efforts to secure and maintain lawful employment, *see* PSR, Doc. No. 39, at ¶¶ 98–101—I considered all of that information when crafting an appropriate sentence. The same goes for Feliciano's troubled upbringing. I am also encouraged to learn that Feliciano thus far has no disciplinary record in prison, *see* Gov't Response, Doc. No. 62, at 6, and, although the parties do not discuss it, I hope that Feliciano is benefitting from treatment for his substance abuse issues. Feliciano's apparent progress, though, is not enough to outweigh the seriousness of this offense, the need to deter Feliciano from committing further crimes, and the need to protect the public.

### III.   Conclusion

For the foregoing reasons, Feliciano's motion for release, doc. no. 58, is **denied without prejudice** to renewal should the situation worsen at MDC Brooklyn. Feliciano's motion to seal his medical records, doc. no. 60, is **granted**.

IT IS SO ORDERED.

Dated at Bridgeport, Connecticut, this 17th day of September 2020.

/s/ STEFAN R. UNDERHILL  
Stefan R. Underhill  
United States District Judge